```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
                      AT SAN ANTONIO

  FERNANDO MORALES,

                    Plaintiff,    No. SA:13-CV-01092-DAE

  vs.
                                  San Antonio, TX
  SQUARE, INC.,                   December 5th, 2014

                    Defendant.

            TRANSCRIPT OF MOTION TO DISMISS PROCEEDINGS
               BEFORE THE HONORABLE DAVID A. EZRA
               SENIOR UNITED STATES DISTRICT JUDGE

                         APPEARANCES
 APPEARING FOR THE PLAINTIFF:

      Mr. Matthew Murrell &
      Mr. John Hendricks
      Reed & Scardino LLP
      301 Congress Avenue, Suite 1250
      Austin, Texas  78701
      512-474-2449
      mmurrell@reedscardino.com
      jhendricks@reedscardino.com

 APPEARING FOR THE DEFENDANT:

      Ms. Stefani E. Shanberg &
      Mr. Eugene Marder
      Wilson, Sonsini, Goodrich & Rosati
      One Market Plaza
      Spear Tower, Suite 3300
      San Francisco, California  94105-1126
      415-947-2000
      sshanberg@wsgr.com
      emarder@wsgr.com

      Mr. Michael D. Paul
      Gunn, Lee & Cave, P.C.
      300 Convent, Suite 1080
      San Antonio, Texas  78205
      210-886-9500
      mpaul@gunn-lee.com
```

COURT REPORTER:

    Kristin M. Anderson, RPR
    United States Court Reporter
    655 E. Cesar E. Chavez Blvd.
    San Antonio, TX 78206
    210-244-5048
    kristin_anderson@txwd.uscourts.gov

Proceedings reported by stenotype, transcript produced by
computer-aided transcription.

1          COURTROOM DEPUTY:  We have *Fernando Morales vs.*
2  *Square, Inc.*, SA:13-CV-1092.
3          THE COURT:  All right.  Good morning.  Can I have
4  appearances, please.
5          MR. MURRELL:  Matthew Murrell for Mr. Morales,
6  Your Honor.
7          THE COURT:  All right.  Good morning.
8          MR. PAUL:  Good morning, Judge.  Michael Paul with
9  Gunn, Lee & Cave for Square, Inc.  This is Stefani Shanberg a
10 and Eugene Marder with Wilson, Sonsini, Goodrich.  And our
11 client back here, Kirupa Pushparaj --
12     Did I say that right?
13         MR. KIRUPA PUSHPARAJ:  Close.
14         MR. PAUL:  Close enough, with Square, Inc.  He's Head
15 Intellectual Property Counsel for Square.  Stefani is from
16 San Francisco, but she grew up here in San Antonio, went to UT
17 to law school, practiced here for a while, and she's back, and
18 happy to have her back, and that's it.
19         THE COURT:  Okay.  Good.
20     All right.  It's your motion.
21         MS. SHANBERG:  Good morning, Your Honor.  Thank
22 you --
23         THE COURT:  Good morning.
24         MS. SHANBERG:  -- for the opportunity to hold an oral
25 argument on this motion that's really important to my client,

1  Square.

2      I would like start out for just a moment and talk about a

3  new case from the Federal Circuit, *Ultramercial*, that we

4  submitted on a notice of supplemental authority because I think

5  it's the most recent comment from the Federal Circuit and

6  perhaps the most relevant to today's motion.  With the added

7  benefit of the Supreme Court's reasoning in the *Alice* case, the

8  Federal Circuit affirmed the Central District of California's

9  grant of a motion to dismiss on the Section 101 grounds.

10      And perhaps the most interesting part of that case to me

11  is Judge Mayer's concurrence because he goes to great lengths

12  to synthesize the four recent Supreme Court rulings on patent

13  eligible subject matter, and he does so in a way that I haven't

14  seen in the, you know, hundreds of Section 101 cases that have

15  been coming down of late.  In his concurrence, he talks about

16  the policy behind Section 101 and how it forms an extremely

17  important gateway to the Patent Act to make sure that an

18  inventor is only entitled to receive the benefit of what his

19  inventive genius actually discovered to make sure that the

20  scope of the claims is commiserate with the technological

21  disclosure in the patent.  And he cautions against claims that

22  are overly broad.

23      And that's exactly what we have here.  What we have here

24  is an inventor, Mr. Morales, who invented a patent entitled

25  Interactive Television System for Mass Media Distribution.  And

1  throughout the presentation today, Your Honor, I have a few

2  boards that I might refer to, and we also have a copy for the

3  bench if you would like to have that closer to you than the

4  board.  But this Interactive Television --

5          THE COURT:  It might be a good idea.

6          MS. SHANBERG:  Okay.

7          THE COURT:  You know, back when I was a very young

8  federal judge, I might have been able to read that.

9          MS. SHANBERG:  I can't read it, Your Honor.

10         THE COURT:  I've been a federal judge for 26 years,

11 and so it's -- I'm not quite -- in those days, I didn't even

12 wear glasses.  Now, I have blended bifocals, trifocals.

13         MS. SHANBERG:  Right now, and for most of our

14 presentation today, we're actually going to focus on this

15 particular slide that's up here that contrasts Claim 5 and

16 Claim 6, and that's because Claim 5 actually covers what

17 Mr. Morales invented.  Mr. Morales' specification explains to

18 us in very clear terms that he invented a television response

19 system in which television viewers are able to respond to

20 things like advertisements and polls and quizzes that are

21 presented in their regular television programming.  And, to do

22 that, they use things like a response unit and a local area

23 computer station.  It's essentially a Wi-Fi access point.

24     But what Mr. Morales is claiming he's entitled to here is

25 far broader.  It's completely different actually than what he

1   invented.  And, as you read through all of the 101 cases that

2   have come down recently, something that really strikes me is

3   that I haven't seen another one where the acute technology is

4   so incredibly far afield from the disclosed patented invention.

5   That's the problem here is that my client's products are credit

6   card readers.  I don't know if you're familiar with the Square

7   product, but they're extremely popular among small businesses

8   because what they essentially are is a little reader that plugs

9   into a cell phone that allows you to turn any cell phone into a

10  sale unit.

11          THE COURT:  Yeah --

12          MS. SHANBERG:  Yeah --

13          THE COURT:  -- I've certainly seen that.

14          MS. SHANBERG:  -- they're -- they're really cool

15  devices that have nothing to do with televisions.  And --

16          THE COURT:  They use them a lot at farmers' markets.

17          MS. SHANBERG:  Yes, exactly.  And the driver who

18  brought me in from the airport had one to swipe my credit card.

19  They're becoming ubiquitous, but they have nothing to do with

20  television.

21      So the reason that Mr. Morales is able to maintain this

22  case against my client's product is because Claim 6 is divorced

23  of any context, and it doesn't actually cover what he invented.

24  I think it's really interesting, Your Honor, as I was preparing

25  for this hearing today, I was rereading some of the old

1    Supreme Court cases.  There's a case, *Gottshalk vs. Benson*,

2    that talks about a case involving Samuel Morse and his

3    telegraph.  And what is fascinating to me about this case, they

4    call it The Telegraph Patent Case, it's from 1854, is that

5    Mr. Morse, we all know, was entitled to a patent covering his

6    telegraph.  And he drafted seven claims that covered his

7    telegraph.  But he had an eighth claim that the United States

8    Supreme Court, back in 1854, rejected.  And they rejected it

9    because he was trying to patent the idea of using

10   electromagnetism to print at a distance but divorced from the

11   context of the telegraph that he had invented.

12       And I warned the court reporter that I have a couple of

13   quotes I want to read from cases that I will go as slowly as I

14   can here.  This is the Supreme Court disallowing Mr. Morse's

15   Claim 8, and I think it's extremely analogous to what Square is

16   asking Your Honor to do today.  The Supreme Court said, if this

17   claim can be maintained, some future inventor in the onward

18   march of science may discover a mode of writing or printing at

19   a distance without using any part of Mr. Morse's

20   specifications, the instructions that Mr. Morse has provided,

21   but, yet, if it's covered by this Claim 8 in the patent, the

22   inventor could not use it, nor could the public have the

23   benefit of it without paying Mr. Morse.

24       And Supreme Court saw that this was wrong, that this

25   wasn't what Mr. Morse had actually invented but rather was a

1   drafting effort to capture more scope than what he had actually

2   disclosed.  And the Supreme Court said no.  And that was back

3   in 1854, and the same concerns belie our patent system today.

4        Here we have Claim 5 versus Claim 6.  And in Claim 5 of

5   Mr. Morales' patent, he includes context.  He includes normal

6   television or radio programs as part of the claim.  He includes

7   audible beeps as part of the claim.  He talks about the

8   questions that are going to be sent to television users, and he

9   talks about the data center as an audience response data center

10  as opposed to just a generic data center.  Claim 5 is limited

11  to Mr. Morales' specification.  It's limited to what he

12  actually contributed to the art.  Claim 6 is not.  Claim 6 has

13  none of that context.

14       So, at this point, Your Honor, I was thinking of jumping

15  into applying the two part Alice Test to Claim 6 unless you

16  have any questions.

17            THE COURT:  Not at this point.  I do have a question

18  for you, but I'll wait until you're --

19            MS. SHANBERG:  Okay.

20            THE COURT:  -- you're done.

21            MS. SHANBERG:  Thank you, Your Honor.

22       So, as you know, I'm sure, you know, in the Alice Test,

23  the Supreme Court set forth a two-part test for patent subject

24  matter eligibility.  It didn't actually change the law, it

25  didn't actually change the world, but it made it clear for the

1   first time.  Prior to the Supreme Court's decision in *Alice*,

2   the district courts, as well as the Federal Circuit, were

3   fractured in how this problem should be analyzed.  But now with

4   the added benefit of the Supreme Court's clarity about what

5   test applies, we can pretty easily and in a pretty

6   straightforward manner apply that test to Claim 6.

7        The Supreme Court unfortunately stopped short of actually

8   delineating what they considered to be an abstract idea.  As

9   many district courts, Judge Brinkema looked at this issue in

10  cases almost identical to the facts here called *Amdocs*.  Many

11  courts have said that, you know, perhaps the reason the Supreme

12  Court was quiet on the subject is because it's actually quite

13  broad what constitutes an abstract idea.  But they left

14  district courts with the challenge of determining what

15  constitutes an abstract idea by analogizing to other abstract

16  ideas.  Which I'm sure, Your Honor, as you read through the

17  briefs, realized it is somewhat of a pain because there are so

18  many cases relating to Section 101 that have come out of late.

19       So we highlight in our brief cases that we think have the

20  most analogous claims to the claim as you hear, Claim 6.  In

21  looking at those cases, it's very clear that what you're

22  supposed to do is essentially find the heart of the invention

23  as the abstract idea.  It's essentially what the claim is

24  directed to accomplish.  And then everything else, the

25  implementation of that abstract idea, is dealt with in Prong 2.

1   So here we've identified, and it's in our brief, the

2   relaying a unique signal containing a sender's identity is the

3   abstract idea.  And, of course, Your Honor probably recognizes

4   that could apply to, you know, Morse Code.  It could apply to a

5   telephone with caller -- caller ID.  But that's the direct --

6   you know, that's what Claim 6 is directed to is relaying a

7   signal containing a sender's identity --

8   And then the next thing the Supreme Court tells us to look

9   at in *Alice* is whether anything meaningful is added.  And *Alice*

10  called it whether there's an inventive step that's added to the

11  claim.  Judge Mayer in *Ultramercial* calls it the technological

12  arts test.  And I actually like the way that Judge Mayer

13  analyzes this perhaps best because what he focuses on is the

14  scope of the claims and whether or not they're commiserate with

15  the technological disclosure, whether when you read the

16  specification you understand what the inventor has invented and

17  whether the claims only cover that.

18  He says that the concern he has is a relative one.  He

19  wants to know how much future innovation is going to be

20  foreclosed relative to the contribution of the inventor as

21  defined by the patent.  Here, again, Claim 5 reflects the

22  patent technological disclosure and Mr. Morales' contribution

23  to the art, but Claim 6 does not.  And *Alice* makes clear that

24  Claim 6 has to have this inventive concept that ties it to the

25  technological disclosure in order to be valid.

1    *Mayo* is another very relevant case here.  That's another

2    Supreme Court case of recent.  And *Mayo* talks about how well

3    understood and routine conventional activity cannot confer

4    patent eligibility.  We cover this in a lot of detail in our

5    brief, so I'm not going to belabor the point here.  But the

6    bottom line is that Mr. Morales failed to identify any of his

7    inventive steps in Claim 6.  He doesn't talk about the

8    television or radio programming.  He doesn't talk about

9    responding to a question.  He doesn't talk about the audience

10   response data center, among other things.

11       I think the case that is most relevant here is *Eclipse IP*.

12   That's a Central District of California case cited in our brief

13   from earlier this year.  And, in that case, the Central

14   District of California granted a motion to dismiss in a case

15   very similar to ours because the claim at issue was stripped of

16   all context that the specification would have provided, and

17   that's exactly our complaint here.  Because Claim 6 is stripped

18   of context, it allows Mr. Morales to expand his alleged

19   monopoly to products that have nothing to do with what he

20   invented.

21       I could go on for hours, but I figure --

22            THE COURT:  Days.

23            MS. SHANBERG:  -- I'll --

24            THE COURT:  Days.

25            MS. SHANBERG:  -- but I will stop here and see if

1   you've got questions.  You know, there are a number of issues

2   that -- that perhaps might come up.  I would like to reserve

3   some time to talk after the argument of opposing counsel --

4           THE COURT:  You know, I just got back from sitting on

5   the Ninth Circuit Court of Appeals, which I do regularly, and

6   this isn't the Court of Appeals, so I'm not going to hold you

7   to five minutes or --

8           MS. SHANBERG:  Thank you.

9           THE COURT:  -- ten minutes or cut you off in the

10  middle of a sentence or something.

11          MS. SHANBERG:  Thank you, Your Honor.  And we also

12  think this is relatively straightforward and spelled out in our

13  briefs, and, you know, don't want to belabor any points that

14  Your Honor is not interested in.

15          THE COURT:  Let me ask you about this.  Counsel --

16  and I'm sure I'm going to hear it from him when he stands up,

17  is arguing that your motion is premature and the Federal

18  Circuit has made some pronouncements, which they have, that 101

19  analysis shouldn't really be undertaken as a general rule, they

20  should -- they don't say in all cases for sure, but, as a

21  general rule, until you've had some opportunity to develop the

22  facts more thoroughly.

23          MS. SHANBERG:  Okay.  So, Your Honor --

24          THE COURT:  You know that line of cases?

25          MS. SHANBERG:  I -- I am familiar with the cases they

1    rely upon --

2            THE COURT:  Right.

3            MS. SHANBERG:  -- for that proposition, but that is

4    the vacated *Ultramercial* decision.  That decision went up to

5    the Supreme Court.  It was vacated.  That's absolutely an

6    outlier position.

7        In our briefs, we cite a number of cases that hold that

8    you actually don't need to go to the expense and burden of

9    claim construction and discovery in order to decide a 101

10   issue.  When *Ultramercial* went back before the appellate

11   circuit -- so *Ultramercial* is the case they relay upon for the

12   proposition, went up to the Supreme Court, got vacated, went

13   back to Federal Circuit.  *Ultramercial*, that we submitted on

14   our notice of supplemental authority, does not so hold.  That

15   the law they cite is bad.  *Ultramercial* is the latest statement

16   from the Federal Circuit on the subject and should --

17           THE COURT:  Excuse me.

18       Excuse me, sir.  You're the client; aren't you?

19           MR. HENDRICKS:  No, sir.

20           THE COURT:  Well, why don't you sit up here with your

21   lawyer?

22           MR. HENDRICKS:  I have not made an appearance in this

23   case.

24           THE COURT:  Aren't you a client -- aren't you the

25   client?

1          MR. MURRELL:  No, he's co-counsel.

2          THE COURT:  Oh, you're co-counsel.  Sit up here.

3    It's all right.

4          MR. HENDRICKS:  Thanks.

5          THE COURT:  Now, who are the lady and gentleman in

6    the back.

7          MS. SHANBERG:  You know what, Your Honor, it's my

8    parents.  I have not had a hearing in San Antonio, Texas, in

9    the 16 years I've been practicing law.  So I figured we would

10   take this opportunity to allow them to join us.

11         THE COURT:  Well, I think that's wonderful.

12         MS. SHANBERG:  My father is an attorney here in town,

13   and I couldn't -- I couldn't say no.

14         THE COURT:  I'm the father of two -- three daughters,

15   two -- two of whom are attorneys.  So I'm very sympathic to

16   that.  I would certainly be --

17         MS. SHANBERG:  Thank you, Your Honor.  It's --

18         THE COURT:  -- I would certainly be here as well.

19         MS. SHANBERG:  It's the first time this has -- this

20   has happened, but I figured it's not going to be everyday that

21   I have a hearing in San Antonio, Texas, so --

22         THE COURT:  Well, yeah.  You're lucky.  Hearing wise,

23   you're lucky you're before this judge because most of the

24   judges here in federal court, as your father, if he practices

25   law here, I don't know, is well aware do not have hearings even

1   in these cases.

2        MS. SHANBERG:  Yeah, I know.  I really appreciate the

3   opportunity.

4        THE COURT:  There is no -- I sit frequently in

5   Austin --

6        MS. SHANBERG:  Okay.

7        THE COURT:  -- as well, and they don't have hearings

8   up there.  I'm the only one who has hearings up there.  It's

9   amazing.  I don't know.  I -- it's just -- I guess it's a --

10  I'm not criticizing, but I find it very helpful, and I think

11  it's very satisfying for a client to have the opportunity to

12  have their lawyer argue their position rather than just submit

13  it on the papers.  And, you know, at the Court of Appeals, you

14  get an argument normally, not always, sometimes things are so

15  clear that we submit them on briefs, but I do think it's

16  helpful.

17       MS. SHANBERG:  Thank you, Your Honor.

18       THE COURT:  All right.  Go ahead.  You --

19       MS. SHANBERG:  Yes.  Going back to *Ultramercial*, when

20  it went back down to the Federal Circuit, they expressed no

21  such concern.  And, in concurrent opinions, Judge Mayer writes

22  that the -- this is actually I think really important in

23  Judge Mayer's opinion, he says that whether the claims meet the

24  demands of Section 101 is a threshold question that should be

25  determined at the outset of the litigation.  And he's not alone

1    in that.  There's so many courts that have said the same thing.

2    He calls Section 101 a gateway to the Patent Act.  And he says

3    that there are a number of different really good reasons for

4    this, for courts to decide 101 motions at the stage of the

5    pleadings.  He says that it conserves the court's judicial

6    resources, which we, of course, recognize are involved in

7    claims construction and any kind of summary judgment hearing.

8    He says that exposing basic deficiencies in a patent claim

9    early in a case, the point of minimum expenditure by the

10   parties is also a benefit --

11            THE COURT:  Okay.  You got to slow down slightly.

12   You're going to burn her out.

13            MS. SHANBERG:  And then Judge Mayer actually gets

14   into the policy behind the recent 101 cases in which the

15   Supreme Court has every single time, you know, dialed in a

16   stricter standard for patent eligibility saying that resolving

17   eligibility at the outset of these cases is a bulwark against

18   fictitious infringement suits.  And that's, frankly, what we

19   see this as.  He talks about -- and, you know, Your Honor

20   doesn't sit in the Eastern District of Texas, so you don't see

21   as many of these, but he talks about the scores of --

22            THE COURT:  Thank goodness.

23            MS. SHANBERG:  -- he talks about the scourge of

24   meritless infringement claims, and the enormous sums of money

25   it costs to defend against them, And he says, you know,

1    addressing Section 101 at the outset thwarts the attempts that

2    some patent owners will put forth to extract settlements that

3    essentially cost less than what it costs to defend these cases.

4         He also says that, you know, claim construction is not

5    necessarily required.  That a lot of these claims, and almost

6    all of the claims that have been determined invalid in the wake

7    of *Alice*, can be determined invalid on their face.  And he says

8    that, determining these cases -- the Federal Circuit said,

9    determining these cases at the outset protects the public from

10   defective patents.  And he also says that, you know, protecting

11   the public from these types of, you know, attempts to

12   monopolize broader scopes than what is actually claimed, you

13   know, is an incredibly important policy initiative behind the

14   Patent Act.  And he says, it's just as important as making sure

15   that an inventor of a truly valuable invention has the benefit

16   of his monopoly.

17        All of these same concerns apply here.  We have extremely

18   costly invalidity contentions due in ten days, discovery is

19   underway in this case, and, you know, we maintain that there

20   are no issues of claim construction.  The invalidity of the

21   claim is clear on its face.  There are no issues for discovery

22   that bear on this issue in any way, shape, or form.  And that

23   this is, you know, wholly appropriate for deciding right now.

24        I will also point Your Honor -- point Your Honor to the --

25   our reply brief to defendant's opposition -- I'm sorry,

1    plaintiff's opposition, at Pages 7 and 8, where we cite a whole

2    slew of cases that have decided Section 101 at this stage on

3    the pleadings of the case.

4           THE COURT:  Okay.  All right.  Why don't you take a

5    seat, and I'll give him a chance.  And then I will give you the

6    opportunity for a brief rebuttal.  All right?

7           MS. SHANBERG:  Thank you, Your Honor.

8           THE COURT:  All right.

9        Good morning, Counsel.

10          MR. MURRELL:  Good morning, Your Honor.  My name is

11   Matthew Murrell with Reed & Scardino.  With me is co-counsel

12   John Hendricks for Mr. Morales.  I am also thankful the Court

13   decided to have an oral argument because this is my first oral

14   argument ever.  The last time I was in San Antonio was as a

15   high school speech debate coach coaching students at --

16          THE COURT:  Where is your office?

17          MR. MURRELL:  In Austin.

18          THE COURT:  Oh, you're in Austin.  Well, you can come

19   see me in Austin.  At least my chambers there, unlike my

20   chambers here, has windows.

21          MR. MURRELL:  Oh, that's great.  We were commenting

22   on --

23          THE COURT:  In Honolulu, where I was for 25 years as

24   a federal judge, I had panoramic windows overlooking Honolulu

25   Harbor.  So this is -- somebody told me I should have taken a

1    photograph and then had it blown up and put on the wall.

2             MR. MURRELL:  That might be true, Your Honor.

3         I would like to start with the same topic that -- that the

4    defendant started with which is the law, and we actually think

5    that the case is clear.  And we also think that *Morse*, in a

6    particular case that they didn't talk about, but it's talked

7    about a lot in the papers, *In re Nuijten*, are especially

8    persuasive here.  In *Morse*, specifically, as Ms. Shanberg

9    noted, the Supreme Court held that you could not patent a

10   signal, a particular -- this eighth element of the -- this --

11   this eighth claim in the patent so --

12            THE COURT:  Well, let me ask you -- let me ask you a

13   question.  If your position is correct, then why is it that

14   when I go to Target, or you go to Target, for instance, or

15   Sears, or anyplace else, and swipe a credit card at the

16   terminal, we are not -- that company is not in violation of

17   your client's patent?

18            MR. MURRELL:  For several reasons, Your Honor.  And I

19   can jump into the facts immediately.  If you want to look at --

20            THE COURT:  Well, let's get right to it because it

21   seems to me that this is analogous --

22            MR. MURRELL:  Well, we would argue it's dis-analogous

23   for a few reasons --

24            THE COURT:   -- because what we've got here is we have

25   a terminal, essentially, that sticks on top of your, or on the

1   bottom, depending upon the model of cell phone you have, and

2   they swipe a card, a credit card, and it takes a payment.  So

3   what's the difference?

4          MR. MURRELL:  Well, the first difference is that the

5   defendants are asking you to look at Claim 6 in the patent and

6   make a lot of factual determinations and claim constructions

7   based on that.  To begin, if you'll look at the language, maybe

8   on the slide that they gave you, there's -- there's different

9   pieces of hardware.  Number one contains an electronic device.

10   Number two and three contain a response unit.  Three, four, and

11   five all contain a local area repeater station, and five

12   contains a data center.  They want you, as the top of the slide

13   says, to strip away all context to determine that all four of

14   those -- those things mean nothing, and that the patent is

15   trying to claim something in the raw, like Morse's signal or,

16   again, *In re Nuijten*, just the signal.

17        But the important distinction is what those courts have

18   said, when a patentee is trying to claim something so broad,

19   the *Morse* court, for example, said if this claim can be

20   maintained, it matters not by what process or machinery that

21   result is accomplished.  And, again, the machine or

22   transformation test has been vacated.  But the *Morse* court

23   said, you're trying to claim this abstract thing on board to

24   any type of machinery at all.  Now, that's been updated because

25   that case is 150 years old.  But the point is that in asking

1  you to look at *Alice* and other cases to determine that this is

2  an abstract idea with no machinery that's not transformed in

3  any way, they're asking you to construe those different pieces

4  of hardware to make them meaningless.

5      THE COURT:  Do Amazon and Netflix license their -- or

6  Roku license their services from your client?

7      MR. MURRELL:  I'm not aware of that, Your Honor.

8      THE COURT:  All right.  Because they can do exactly

9  or virtually the same thing with a -- with a remote control.

10  If you have a Roku player, a remote control, I don't know

11  whether you do or you don't, a lot of people do, and you go on

12  Roku, or you get to the Amazon ap, and you want to watch a

13  movie, you can rent that movie, or you can purchase that movie

14  using the remote control which then sends a signal through a

15  repeater to a terminal which then charges your credit card on

16  file with Roku, and you pay for the movie.  What's the

17  difference?

18      MR. MURRELL:  Well, Your Honor, I would argue that

19  there's not a demonstration in that instance that these five

20  unique steps of the process are occurring in that instance.

21  And to determine that those are occurring, to determine that

22  Roku -- the Roku device is receiving an audio -- audio signal,

23  and generating a unique signal, which is step one, to determine

24  whether --

25      THE COURT:  Well, I would hope they would be or else

```
 1   my credit card information would be flying all over the
 2   universe, which it may be anyway, but --
 3           MR. MURRELL:  Well, Your Honor, I -- I would say, in
 4   that instance, I would have to, again, for 12(b)(6) purposes,
 5   we can't do the factual inquiry that we -- we would need to do.
 6   But, in that instance, I would argue that the audible signal
 7   may be -- be present there.  One unique thing about the Square
 8   device is that the Square device plugs not into the proprietary
 9   port of the cell phone but into the audio port of a cell phone.
10   And if the Square -- the little Square reader converts the
11   magnetic swipe into an audible signal and --
12           THE COURT:  Is there a similar device plugging into
13   anything in your client's patent?
14           MR. MURRELL:  No, Your Honor.
15           THE COURT:  All right.  I didn't think so.
16           MR. MURRELL:  I mean not -- not similar in the sense
17   that it doesn't look like a Square reader, but it is --
18           THE COURT:  It doesn't -- it doesn't operate like a
19   Square reader either; does it?
20           MR. MURRELL:  Well, that -- not -- the other claims
21   don't --
22           THE COURT:  I mean when somebody -- when somebody --
23   excuse me.  When somebody uses -- they used to have these
24   devices, I'm old enough to remember them, when -- where you
25   would have a credit card slide on a remote control, and that
```

1  would be very much like a Square reader.  And you would then

2  swipe your credit card on the remote control, and then that

3  would get transmitted through some form or fashion, and you

4  would get charged.  That isn't what goes on now with most

5  remote controls, that I'm aware of, for many reasons,

6  principally, because it would delimit, significantly, the

7  incentive for people to go ahead and rent movies.  Because when

8  you have to pull out a credit card, you think to yourself, oh,

9  do I really want to spend 4.99 to rent this movie.  And where's

10 your credit card.  And you're searching for your wallet in your

11 purse to get your credit card, and then, by that time, you

12 probably say forget it.

13     It's much easier just to get into the -- the ap.  You

14 don't see it, you don't touch a credit card, and you push the

15 button, and there it is.  And so that technology is obsolete,

16 essentially, from a benefit standpoint to the -- to the

17 companies that want you to spend that money to rent that video

18 or to buy it.

19          MR. MURRELL:  Sure.

20          THE COURT:  What you've described to me, basically,

21 doesn't have the Square technology.  What you've described to

22 me is a very general process because the Square technology

23 requires, requires, we're not talking about this new Apple Pay

24 thing, where you just, you know, blue tooth it next to the

25 register, and it -- and it clicks in.

1     What we're talking about is a requirement that somebody

2   pull out a credit card and slide it through the mini terminal,

3   which is hooked to your cell phone.  That has nothing to do

4   with what your client patented.  Your client's patent doesn't

5   have or require any type of physical activity of that kind or

6   any transmittal of information of that kind.

7             MR. MURRELL:  So two responses to that -- to that,

8   Your Honor.  The first is that is an infringement question that

9   is completely inappropriate to address here at this stage.  I

10   appreciate --

11             THE COURT:  Well, it goes to -- Counsel, look, this

12   isn't my first --

13             MR. MURRELL:  Sure.

14             THE COURT:  -- merry-go-round.  If you've done your

15   homework on me, you know I've handled a lot of patent --

16             MR. MURRELL:  Yes, Your Honor.

17             THE COURT:  -- cases, and I try to be careful.  Knock

18   on wood, I've been pretty successful at the Federal Circuit and

19   that could change here but hopefully not.  But, you know, what

20   I'm looking for is a determination, and the whole point of this

21   motion is whether we have something which is even patentable to

22   the degree that you're seeking the -- I mean the expansive

23   nature of your patent.  That's the whole issue here under 101.

24             MR. MURRELL:  I agree, Your Honor.

25             THE COURT:  So that is the issue.

1          MR. MURRELL:  I agree that the scope of the claim is

2    the issue.  The problem that I have that returns to what we

3    talked about before is that they're asking you to -- again,

4    this is not an apparatus, so it doesn't need to look like the

5    device.  It's not a device.  It's a method with five steps.

6    And the Court in the *Morse* decision, in *Alice*, and -- and the

7    Federal Circuit in *In re Nuijten* have specifically said that

8    where there is an abstract idea, like in *In re Nuijten*, the

9    2007 Federal Circuit case that both parties talk about in their

10   papers, the patent he tried to claim is a signal.  And the

11   Federal Circuit said there, specifically, you can't get the

12   signal.  However, if the signal was part of a traditional

13   step-by-step process, or there was an apparatus that was

14   generating, receiving, processing, or storing that signal, then

15   that's something that could be patent -- patentable.

16        And that is our argument, Your Honor, is that there is a

17   five-step process here.  They want to claim that this preempts

18   everything.  But in order to get to that conclusion --

19          THE COURT:  No, no, you want to claim it preempts --

20          MR. MURRELL:  No.  No, they claim that it preempts

21   all signal processing and e-mail and telephone.  They say that

22   in their -- in -- in their motion.  They say that this is so

23   broad that it would preempt all of those things.

24          THE COURT:  Oh, I see what you're saying --

25          MR. MURRELL:  It would capture all of that.

1          THE COURT:  -- we're saying the same thing in a

2   different way.

3          MR. MURRELL:  Right.  Yeah.

4          THE COURT:  That's -- I'm struggling with trying to

5   figure out what type of electronic payment activity wouldn't be

6   covered under your client's patent if I accept your argument.

7          MR. MURRELL:  Well, I think that there would be --

8          THE COURT:  I'm struggling to figure it out

9   because --

10          MR. MURRELL:  -- I think that there would be several

11   types of -- of payment technology --

12          THE COURT:  Like what?

13          MR. MURRELL:  -- that would use -- for example, when

14   you argued -- or when you gave an example earlier of how

15   we've -- as -- as a society, we've moved away from swiping

16   credit cards.  If there were a transaction where somebody typed

17   in their credit card number and --

18          THE COURT:  Here, let me give you the example that

19   I'm thinking of that is still, to some degree, in use.  It's

20   going out but to some degree in use.

21      Fly in an airplane, right, you're on a plane --

22          MR. MURRELL:  Okay.

23          THE COURT:  -- and you want to watch Direct TV.

24   Let's say you're not in First Class.  Let's say you're not a

25   partner in a good law firm.  You're a federal judge, and you're

1   sitting back in coach, and you want to watch Direct TV.  They

2   have that little phone thing which you pull out and you have to

3   swipe your credit card --

4            MR. MURRELL:  Okay.

5            THE COURT:  -- and that gets electronically

6   transmitted virtually the same way that Square's does.

7            MR. MURRELL:  I don't know if we can make that

8   determination at this point, Your Honor, because you would have

9   to presuppose that that device --

10           THE COURT:  Well, it certainly doesn't stay in the

11  phone.

12           MR. MURRELL:  But you would have to presuppose that

13  these five steps are happening.  So, in that instance, you

14  would have to assume that when the flight attendant swipes

15  the -- the card --

16           THE COURT:  No, no, no.  Wait a minute.  I'm not

17  talking about the flight attendant's use of -- well, that's

18  another -- that's another great example actually.  The flight

19  attendant swipes your credit card on a mobile device in order

20  to have you purchase a sandwich or something; right?

21           MR. MURRELL:  Right.

22           THE COURT:  That's not what I'm talking about, but

23  although it's quite similar, I'm talking about the device that

24  we -- we've seen recently on the backs of -- you know, where

25  you --

```
 1              MR. MURRELL:  Sure.

 2              THE COURT:  -- swipe the thing, or it's in the

 3   handset, and you swipe it, and then you can watch Direct TV --

 4              MR. MURRELL:  So --

 5              THE COURT:  -- or whatever.

 6              MR. MURRELL:  -- so the argument would be the same,

 7   Your Honor, we don't know how that device works.  So, for

 8   example, when you swipe the credit card, we don't know if that

 9   device is receiving -- is generating a unique signal by

10   receiving an audible system.  That is, we don't know if that

11   device is converting that credit card swipe into an audible

12   signal.  We know the Square device does that.  So that's one

13   limitation.

14          The second limitation is, again, without an audible

15   signal, we don't know if that device is performing the second

16   step of the method, which is combining the received signal with

17   a unique identifier of the response unit.  Now, I would argue,

18   to -- to go back to the other examples you talked about, lots

19   of those devices we don't know if the way -- if the step in

20   processing a credit card transaction is receiving an audible

21   signal, which is a great limitation and the -- and the marking

22   limitation on this.

23          They want to argue that applies to everything.  We just

24   don't know that.  The uniqueness of the Square device is that

25   it doesn't transmit in a data form.  It transmits into an
```

1    audible form.  And we have, again, a 12(b)(6), you're not

2    supposed to talk about evidence, but Square engineers talk

3    about how that when you swipe that credit card, it converts it

4    into a wave file, and it converts it into audio.  And that's

5    what's unique about Square that -- that may or may not be

6    present in these other devices.  But my point is we would have

7    to conduct --

8              THE COURT:  I don't know if it's that unique about

9    Square.  I mean that's the way fax machines operate.

10             MR. MURRELL:  But the -- the point is that we would

11   have to conduct a factual inquiry, number one.  Number two, we

12   would have to construe these claims, and we would have to look

13   at all of this outset evidence which the Federal Circuit says

14   we just can't do it, 12(b)(6).

15       Now, they've argued that there are some cases where

16   12(b)(6) -- that the Federal Circuit and district courts have

17   allowed it at this stage, and while that's true, in those

18   cases, there wasn't a question where you had to make these

19   factual determinations.  And in most of those cases where it

20   failed at *Alice* Step 2, which is, is there a machine or is

21   there an inventive aspect, i.e., is there a machine that

22   transforms this.  The machine quite obviously was a computer.

23   We have several machines in here that you would have to -- to

24   determine are computers that don't transform this abstract idea

25   at Step 1 into an inventive aspect -- a patentable invention at

1    Step 2.

2        And I think *Morse* and *In re Nuijten*, when you get into the

3    weeds of those cases, would be incredibly difficult to

4    distinguish for opposing counsel.  And if you were writing an

5    opinion, *In re Nuijten* is a fantastic case for us because in

6    that instance the Federal Circuit has said you don't get to

7    patent a signal, but you can patent processing the signal.  You

8    can patent apparatuses and other things doing the signal.  You

9    can patent a traditional step-by-step process that uses a

10   signal.  You don't get the signal itself.  And I think that

11   that is incredibly informative.  If the Court needs to go

12   further to make a determination here, to construe these terms,

13   to look at outside devices, like the Roku device, or like a

14   headset on the back of an airplane, that's a factual inquiry

15   that is impermissible at the 12(b)(6) stage.

16            THE COURT:  Okay.  Thank you very much, and I

17   understand your argument.

18        All right, Ms. Shanberg.

19            MS. SHANBERG:  All right.  I'll be brief, Your Honor.

20        So, first of all, we think that you've honed in on

21   precisely the important question which is how much future

22   innovation may be foreclosed relative to the contribution of

23   the inventor.  So whether or not each of the different devices

24   infringes is -- is, you know, obviously, not something we -- we

25   are specifically talking about today.  We're more talking about

1    it in context.  You know, Claim 6 is a -- is about the -- you
2    know, about the lack of context in Claim 6.  I mean we're
3    talking about the possibility that Claim 6 could foreclose all
4    of those things that Your Honor brainstormed.  And that's
5    precisely what the Federal Circuit has cautioned us we should
6    not allow a claim to do.
7         Mr. Morales is no stranger to patent litigation.  He has
8    around 16 patents.  He's been involved in a lot of patent
9    litigation.  And he -- he knows exactly what he's got here in
10   Claim 6.  There are letters in the record from the Northern
11   District of California case that was dismissed where
12   Mr. Morales talks about how broad his patent is.  And he
13   giddily talks about how it covers everything.  So, you know,
14   Mr. Morales might not agree with his counsel that those things
15   are distinguishable from Claim 6.
16        In addition to that, you know, the only factual issue that
17   I actually heard opposing counsel mention in any level of
18   specificity is audible signals.  And audible signals simply
19   cannot be the inventive concept in this case.  Audible signals
20   are discussed throughout the file's history, which Your Honor
21   could take judicial notice of, but I don't think it's necessary
22   today, as being something that were ubiquitous in the prior
23   art, and they're ubiquitous in technology today as well.  So we
24   think Your Honor has honed in on exactly the right inquiry.  We
25   think Mr. Morales certainly reads claim stakes as broadly as

1    Your Honor sees it.

2        *In re Nuijten* has nothing to do with this.  We talk about

3    it in our reply brief.  The test for a patent eligibility is

4    actually a longer test than what we have to look at today.  You

5    know, first you look to see if something is a process or a

6    composition of matter that is actually patentable.  Then you

7    look to the exceptions.  Today we're talking about the abstract

8    idea exception to patentability.  *Nuijten* is way up at that top

9    level.  And what they said is a signal by itself is not

10   patentable.  And the reason we cited that case was to say that

11   the signal can't be the inventive concept in this claim.  We

12   didn't cite this case to say, you know, that *Nuijten* tried to

13   patent a signal, and it was rejected.  It's actually used for a

14   very different purpose --

15             THE COURT:  Hence --

16             MS. SHANBERG:  -- and on a very different point.

17             THE COURT:  -- let me -- let me ask you this.  And I

18   haven't gotten that deep into it, but I will.  Has this

19   particular patent been tested previously in federal court?

20             MS. SHANBERG:  Not this patent, no, Your Honor.

21             THE COURT:  Okay.  I see.

22             MS. SHANBERG:  Others of Mr. Morales' patents have,

23   but not this one.

24             THE COURT:  All right.

25             MS. SHANBERG:  And then the last thing I want to

1 leave you with, and this is --

2          THE COURT:  That's too bad.

3          MS. SHANBERG:  This is his first, Your Honor.

4      Truly, the last thing that I want to leave you with --

5          THE COURT:  I always ask that question.  I never get

6 a positive answer unfortunately.

7          MS. SHANBERG:  Right.

8      Now, the District of Delaware actually found one of his

9 other patents invalid but not this one.

10      The last thing I want to leave with Your Honor is the

11 *Amdocs* case.  It's *Amdocs vs. Openet Telecom*, and it's from

12 Judge Brinkema in the Eastern District of Virginia.  It's not

13 in our brief because it's just from October 24th, 2014.  And

14 Judge Brinkema had looked at, I'm not kidding you, the

15 identical issues that we're presenting to you here today.  So I

16 would like to leave you with that case cite, and then I'll wrap

17 up unless you have any questions.  That is 2014, WL 5430956.

18          THE COURT:  Okay.

19          MS. SHANBERG:  Thank you, Your Honor.

20          MR. MURRELL:  When the Court turns to its research,

21 I'd like to provide two citations.  The citations are *In re*

22 *Nuijten* is 500 F.3d at 1351.  And that's the specific claim

23 which -- that says you can get a process, a traditional process

24 or an apparatus that -- that processes or does a method.  You

25 don't get the signal itself.  And we think that that's

1  informative.

2      And the other is the *Prometheus* case, 132 Supreme Court at

3  1293, and that says that you can't strip away all of these

4  limitations and all of these things to get to the heart of

5  invention and only look at the heart of the abstract idea

6  because you could do that with every patent, and, at this rate,

7  patent law.

8      And my final words, I'll just remind the Court when it --

9  when it turns to -- to truly deliberating on this, 101 is about

10  patent eligibility.  It is not about infringement.  It's not

11  about the scope of the claims.  It's not about devices out in

12  the world that aren't accused that it would cover.  It's about,

13  on the face of the patent, is it an abstract idea that is not

14  transformed into an inventive idea.

15      Thank you, Your Honor.

16          THE COURT:  Ms. Shanberg, you actually, technically,

17  get the last word.  Do you have anything else to add?

18          MS. SHANBERG:  I have nothing further to add,

19  Your Honor.  Thank you for allowing us oral argument today.

20          THE COURT:  That's all right.

21      All right.  Well, I have actually looked into this, and my

22  law clerk, Peter, here has gotten a big headache over this

23  already.  He started to look into the law and -- but I'm going

24  to take another very hard look at this.  These cases, unlike a

25  good portion of the cases which I decide, which, for whatever

1   reason, don't go up on appeal, almost all of these patent cases
2   end up in the Federal Circuit.  And so I try very hard to make
3   sure that in deciding it, first of all, that I'm right.  I try
4   to do that in every case obviously.  But I also try very hard
5   to make sure that I put out a written reasoned order and not
6   just for the parties' benefit but also so that the judges of
7   the Federal Circuit have my reasoning in some detail, and they
8   can either agree or disagree with me, but at least they'll know
9   what I did.  I don't -- I don't simply rule off the cuff or put
10  out a three-line order.  I think that's not very helpful to
11  either side.
12      I will try to get this out as quickly as I can.
13  Unfortunately, you probably know, or maybe you don't know, we
14  are either the busiest or the second busiest district in the
15  United States which is why I'm here.  This is not the senior
16  judgeship I had envisioned.  I have a full criminal and civil
17  caseload here, plus I have cases in Del Rio, where I just
18  returned, and I have cases in Austin, and a pretty good chunk
19  of cases in Austin.  And they're all civil cases in Austin.
20  And that's not your problem.  That's my problem.  But it does
21  play, to a degree, on how quickly I can get this out.
22      Now, that having been said, I'm usually pretty quick, but
23  this is a complex issue.  These patent cases are not to be, you
24  know, trivialized.  You know, there is a high percentage of
25  district court cases that get reversed in the federal circuit.

1  I think even higher than the Ninth Circuit which is pretty

2  high, and I think the reason for that is because these are

3  tough cases, you know.  And a lot of these cases, these patent

4  cases, turn on -- to a degree, on the context, and one judge

5  will look at it one way, and another judge will look at it

6  another way.

7      And so the best I can do for the parties is to look at it

8  as carefully as I can.  I certainly appreciate your arguments.

9  I think both of you did as well as anyone.  I don't think I --

10 I mean I've had some of the most experienced patent attorneys

11 in front of me in the United States.  I just got affirmed in

12 the Federal Circuit in a case involving one of the largest

13 internet gambling patent cases ever in Las Vegas.  And I had

14 extremely experienced patent counsel there in that case.  I

15 don't think their arguments were any better than the arguments

16 I heard, you know, today.  So you -- both of you did an

17 excellent job.  Don't be put off by questioning.  It shouldn't

18 signal one way or the other how I'm going to rule.  I was an

19 adjunct professor for 34 years, and I ask questions.

20      So I want to thank you.  I hope you have a happy holiday.

21 Hopefully, I will get this out before the end of the year.  I'm

22 going to work real hard to try to do that.  If not, it should

23 be in early January.  I'm not going anywhere so -- but,

24 unfortunately, my law clerks are fortunately.  They would like

25 to see their families, and they do help me with the research on

1  this.  And so we're going to try to get it out, but we're

2  running right up against the holidays as you know.  So we'll

3  see.  If we don't get it out before the end of the year, we'll

4  get it out early in January.  You can go from there one way or

5  the other.  Okay.

6       All right.  Thank you very much.  I appreciate your

7  arguments.

8       Do you need this back, Counsel?

9            MS. SHANBERG:  No.

10           THE COURT:  No.  Okay.

11           MS. SHANBERG:  It's yours to keep, Your Honor.

12           THE COURT:  All right.

13           COURT SECURITY OFFICER:  All rise.

14                (Whereupon said Motion to Dismiss proceedings

15  concluded.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Kristin M. Anderson, a Registered Professional
Reporter, and Official Court Reporter for the U.S. District
Court, Western District of Texas do hereby certify:

        That the foregoing is a true and correct transcript
of the proceedings transcribed from my stenographic notes in
the above-entitled matter;

    That I am not a relative or employee or attorney or
counsel of any of the parties, or a relative or employee of
such attorney or counsel, or financially interested in the
action.

        WITNESS my hand on this 15th day of December, 2014.




        _/s/ Kristin M Anderson_
        Kristin M. Anderson, RPR
        United States Court Reporter
        655 E. Cesar E. Chavez Blvd.
        San Antonio, TX 78206